# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

IN RE: LAWNMOWER ENGINE                MDL. No. 08–1999
HORSEPOWER MARKETING & SALES
PRACTICES LITIGATION

| This Document Relates to All Cases |
| --- |

## DECISION AND ORDER

The present litigation consists of multiple class actions that the Panel on Multidistrict Litigation transferred to this district and consolidated for pretrial purposes. The predominant issue in all actions is whether manufacturers of lawnmowers and/or lawnmower engines conspired to materially overstate and/or fraudulently advertise the horsepower produced by their lawnmower products. The parties have reached a global settlement. In prior orders, I certified settlement classes and preliminarily approved the settlement agreements. On June 22, 2010, I held a final fairness hearing. Before me now are plaintiffs' motion for final approval of the settlements, plaintiffs' motion for attorneys' fees, and several related motions. This order also addresses a dispute that has arisen among the defendants concerning their rights to contribution and indemnification against each other.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs have filed class action complaints in all fifty states, the District of Columbia and the Commonwealth of Puerto Rico, alleging that, since 1994, defendants[1] have been

---

[1]The defendants fall into three general categories: manufacturers of lawnmower engines (Tecumseh Products Company, Platinum Equity, LLC, Briggs & Stratton Corp., Kawasaki Motors Corp. USA, American Honda Motor Company, Inc., and The Kohler Company), original equipment manufacturers of lawnmowers, or OEMs (Deere & Co., MTD

engaged in a conspiracy to inflate the price of lawnmowers by manipulating the horsepower ratings of lawnmower engines. According to plaintiffs, lawnmower engines with greater horsepower produce more power, more power means "better and faster" lawnmower performance, and consumers generally consider lawnmowers with greater horsepower to be "better" lawnmowers. Defendants thus sell lawnmowers represented as having greater horsepower at higher prices than those with supposedly less horsepower.

Under plaintiffs' theory of the case, defendants manipulate the horsepower labeling on their products in two different ways. First, defendants overstate the horsepower of their products, advertising products as having greater horsepower than they actually do. Second, defendants market and sell lawnmowers containing identical engines as two different products, one with supposedly greater horsepower than the other. Plaintiffs allege that defendants conspire with one another to ensure that they are all consistently misrepresenting their horsepower ratings. Plaintiffs further allege that defendants, though various trade groups, have adopted phony horsepower labeling standards designed to conceal their fraudulent acts and facilitate a price-fixing scheme. Plaintiffs contend that these actions violate federal and state antitrust statutes, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), state consumer protection and warranty statutes, and state unjust enrichment and conspiracy laws.

Class counsel began investigating the lawnmower industry in 2003, shortly after learning of this alleged fraud and conspiracy from an industry insider. Counsel investigated

_____

Products Inc., The Toro Company, Electrolux Home Products, Inc., and Husqvarna Outdoor Products, Inc.), and Sears, Roebuck & Co., a retailer that sells lawnmowers under its store brand, Craftsman, that are manufactured or contain engines that are manufactured by the other defendants.

and confirmed the insider's information and, in 2004, filed a nationwide class action in Illinois state court. Defendants responded by filing eighteen separate motions to dismiss. While the motions to dismiss were briefed and argued, plaintiffs initiated discovery. Shortly thereafter, defendants suggested that the parties begin settlement negotiations. The parties then engaged in mediation that continued into 2005. To further settlement negotiations, defendants provided plaintiffs with extensive sales and engineering data, and plaintiffs hired expert witnesses to analyze this data and evaluate plaintiffs' likelihood of success on the merits of their claims and the amount of damages they could establish at trial.

In May 2005, while global settlement talks continued, defendant MTD approached plaintiffs and offered to enter into a unilateral settlement. By June 2005, plaintiffs had reached a settlement agreement with MTD, pursuant to which plaintiffs released MTD from liability in exchange for MTD's agreement to cooperate with plaintiffs against the remaining defendants. MTD also agreed to change its labeling practices so that they were no longer misleading. However, MTD did not agree to pay any money to the class.

According to plaintiffs' counsel, MTD's cooperation has been invaluable. Among other things, MTD provided plaintiffs with physical evidence showing that defendants sell identical engines with varying horsepower labels; information regarding a secret group, code named the "Eagle Group," which took concerted steps to institute an industry standard designed to cover defendants' fraudulent practices; details showing how defendants manipulate horsepower tests to mislead consumers; evidence showing that horsepower inflation was openly discussed at meetings among defendants; documents demonstrating the direct correlation between price and horsepower; evidence that certain defendants provided certain retailers with exclusive horsepower arrangements whereby the preferred

3

retailer would get the exclusive right to use purportedly higher horsepower labels than other retailers for the same engines; and evidence substantiating plaintiffs' allegation that defendants provide different horsepower numbers to the EPA and state environmental protection agencies than they do to consumers.

Armed with the information provided by MTD, plaintiffs continued global mediation with the remaining defendants. Initially, the mediation was unsuccessful. However, defendant Honda agreed to participate in separate mediation sessions with a different mediator. These negotiations led to a separate settlement with Honda, which was finalized on December 21, 2006. Pursuant to the settlement, Honda agreed to pay $7.5 million to the class.

Meanwhile, defendants removed the Illinois state-court action to the U.S. District Court for the Southern District of Illinois pursuant to the Class Action Fairness Act and filed new motions to dismiss. Plaintiffs then filed a motion for preliminary approval of the MTD settlement. On March 30, 2007, the court made an entry on the docket indicating that the complaint was dismissed with leave to re-plead and that plaintiffs should resubmit the MTD settlement agreement for preliminary approval after filing an amended complaint. More than one year later, on May 8, 2008, the court issued a memorandum in which it explained its decision. The court dismissed the RICO claim with prejudice and dismissed the non-Illinois state-law claims without prejudice, indicating that plaintiffs could re-file class action complaints in each state whose laws were at issue. The court also stated that it was rejecting the MTD settlement because it would provide nothing of value to the class.

Following the court's decision, plaintiffs began filing class actions in every jurisdiction in the United States. Defendants then moved the Panel on Multidistrict Litigation to

centralize all cases for coordinated pretrial proceedings. On December 5, 2008, the panel granted the motion and ordered that all cases be transferred to me for pretrial purposes. Shortly after the cases were transferred here, the parties indicated that they wanted to resume global settlement negotiations. Pursuant to the parties' request, I stayed all litigation on the merits so that they could focus on mediation with Edward Infante, a retired magistrate judge. Over the course of the next several months, the parties engaged in multiple rounds of mediation with Judge Infante. Eventually, plaintiffs reached a settlement with the "Group of Six" defendants – Sears, Deere & Company, Tecumseh, Briggs & Stratton, Toro, and Husqvarna/Electrolux. Shortly thereafter, Kawasaki entered into a separate settlement with plaintiffs, as did the final non-settling defendant, Kohler. The Group of Six and Kawasaki settlements were finalized on February 24, 2010, the Kohler settlements on March 2, 2010.

The Group of Six, Kawasaki and Kohler settlements provide three different forms of relief to the class. First, each settlement has a monetary component. The Group of Six will pay the class $51 million, Kawasaki will pay $3 million, and Kohler $3.5 million. When these amounts are added to Honda's $7.5 million cash payment, the total amount of cash available to the class is $65 million. At the preliminary approval hearing, counsel estimated that this fund would allow payments to class members in the amount of $35.00 for every "walk-behind" lawnmower and $75.00 for each riding lawnmower. However, in light of the large number of claims received, the cash payments will be reduced pro rata. Plaintiffs' counsel estimates that after all costs and attorneys fees are deducted from the settlement fund – including counsel's requested fee award, the costs of litigation, notice and administrative costs, and service payments to class representatives – the actual payments to class members will be $10 to $15 for walk-behind mowers and $23 to $28 for riding

5

lawnmowers.

Second, the Group of Six, Kawasaki and Kohler settlements provide extended engine warranties to class members who own lawnmowers containing engines manufactured by Briggs & Stratton, Toro, Tecumseh, Kawasaki and Kohler. The only engine manufacturer that has not agreed to provide an extended warranty is Honda, and that is because Honda settled with plaintiffs before engine warranties were incorporated into the global settlement negotiations.[2] The net effect of the warranty benefits is that every class member who still owns his or her lawnmower, except those owning lawnmowers with Honda engines, will receive warranty benefits.[3] If the class member's original engine warranty has expired, the class member will receive a new, one-year warranty. If the class member's original warranty is still in effect, one year will be added to the warranty's remaining term. In either case, the class member's extended warranty will have the same coverage as did the class member's original engine warranty. That is, defendants did not create unique warranty terms for the purpose of settling this litigation. Plaintiffs' counsel states that the retail value of this warranty relief to the class is $62 million, although for reasons I explain below I conclude that the warranty relief is worth about $45.7 million.

Third, the Group of Six, Kawasaki and Kohler have agreed to injunctive relief covering their horsepower marketing and sales practices for at least the next ten years. This relief

---

[2] At the fairness hearing, counsel for Honda stated that when Honda heard about the warranties contained in the other defendants' settlements, it offered to renegotiate its settlement agreement to include warranty benefits in exchange for a lower cash payment. Plaintiffs stated that they preferred the higher cash payment.

[3] This applies even to customers of MTD, since MTD does not manufacture engines. All of its mowers contain engines manufactured by other defendants. Thus, any MTD customer whose engine was not manufactured by Honda will receive an extended warranty.

is similar to the injunctive relief agreed to by MTD.  Specifically, defendants are required to

obtain a "Certified Power Rating" before they label any engine with a horsepower rating.

This Certified Power Rating is a new horsepower testing protocol that was developed by the

parties and their engineering experts.  To obtain a Certified Power Rating, defendants are

required to select engines at random from their existing stock and test a sufficient number

to determine the horsepower produced.  At least one engine used in the testing must be

retained for the entire period of time in which the defendant relies on the test results. If a

defendant alters its engine manufacturing process, or if any changes are made to an engine

that affects the previously certified rating, the defendant must obtain a new certified rating

for that engine.  Defendants will make the results of all tests available to the public within

thirty days after obtaining the results.  The written materials that accompany the lawnmower

at the point of sale must identify where the consumer can review the Certified Power Rating

test results.  The testing equipment, the tests themselves and the test results must be

certified by a "Certified Engine Tester," an independent U.S. testing entity or person who is

not employed by any engine manufacturer, lawnmower manufacturer or other defendant in

this litigation.

After settling with all defendants, plaintiffs asked me to certify settlement classes and

preliminarily approve the settlement agreements, which I have done.  The settlement class

is defined as follows:

> All persons or entities in the United States who, beginning January 1, 1994,
> up to and including [April 12, 2010[4]], purchased, for their own use and not for
> resale, a lawnmower containing a gas combustible engine up to 30

---

[4]The class period ends on the date notice was first issued to the class, which
occurred on April 12, 2010.

horsepower, provided that either the lawnmower or the engine of the lawnmower was manufactured or sold by a Defendant.

Notice of this action and the settlements has been given to the class in accordance with the notice plan that I approved.  Class members have until August 31, 2010 to file claims for cash benefits, and until one year after the settlements are finally approved to submit claims for warranty benefits.  As of June 10, 2010, class members had submitted 1,058,693 claims for benefits.  Based on the claims rate, the claims administrator, Rust Consulting, Inc., estimates that it will receive 158,400 additional claims by the deadline for filing cash claims, and an additional 13,200 claims by the deadline for claiming warranty relief. The deadline for either opting out of the class or objecting to the settlement was June 4, 2010.  As of that date, 1,479 class members had opted out and 68 class members had objected to the settlements and/or class counsel's request for attorneys fees.

Class counsel requests that I award them attorneys' fees out of the $65 million settlement fund.  They request a total fee of $34,666,667, plus interest.  They arrive at this fee by taking one-third of the settlement fund ($21,666,667) and adding $13 million as a fee for obtaining the extended warranty and injunctive relief.  In addition to this fee, counsel request reimbursement of their litigation expenses in the amount of $576,391.19.  Counsel also request that each class representative be paid a "service award" of $1,000.  Since there are 132 class representatives, the requested service award would be $132,000.  In addition to paying class counsel and the class representatives, the settlement fund must be used to pay notice and administrative costs.[5]  As of May 31, 2010, notice and administrative costs

_____

[5]Some of the objecting class members have argued that MTD is required to pay notice costs.  As discussed below, I conclude that MTD is not required to pay notice costs, and that therefore notice costs must be paid from the settlement fund.

were $8,389,531.13.

Although all of the defendants support the global settlement, a dispute has arisen among them regarding the actual language of the proposed orders approving the settlement agreements. The dispute is over whether I may enter "bar orders" that extinguish any claims for contribution or indemnification that defendants may have against one another.

Below, I address whether the various settlements are fair, reasonable and adequate; whether the plan for distributing benefits to the class is reasonable; class counsel's request for attorneys' fees, costs and class-representative service payments; the objections raised by objecting class members; and the defendants' dispute with each other regarding their rights to contribution and indemnification.

## II. DISCUSSION

### A. Adequacy of the Settlements

Under Federal Rule of Civil Procedure 23(e)(2), a court may approve a settlement in class action litigation only if it finds that the settlement is "fair, reasonable, and adequate." In order to evaluate the fairness of a settlement, the court must consider "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." Synfuel Techs., Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 653 (7th Cir. 2006) (internal quotation marks omitted). In evaluating the fairness of the settlement, I view the facts in the light most favorable to the settlement. Isby v. Bayh, 75 F.3d 1191, 1199 (7th Cir. 1996). Further, I must not substitute my own judgment as to optimal settlement terms for the

judgment of the litigants and their counsel.  <u>Armstrong v. Bd. of Sch. Dirs.</u>, 616 F.2d 305, 315 (7th Cir. 1980), <u>overruled on other grounds by</u> <u>Felzen v. Andreas</u>, 134 F.3d 873, 875 (7th Cir. 1998).

The first and most important consideration is the strength of the plaintiffs' case compared to the value of the settlement.  <u>Synfuel</u>, 463 F.3d at 653.  Thus, to evaluate the settlement's fairness, I must make some effort to quantify the value to the class of continued litigation.  The Seventh Circuit recommends that district courts quantify this value by "estimating the range of possible outcomes and ascribing a probability to each point on the range."  <u>Reynolds v. Beneficial Nat'l Bank</u>, 288 F.3d 277, 284-85 (7th Cir. 2002). Although a precise valuation cannot be expected, I should attempt to arrive at a "ballpark valuation." <u>Id.</u> at 285.

In the present case, the parties have attempted to quantify the value of continued litigation by providing estimates of the amount of damages the class could expect to recover at trial if it were able to establish that defendants had overstated the horsepower of their lawnmowers.  Class counsel estimates that damages would be in the range of $816 million to $2.5 billion, while defendants estimate that damages would be $68 million to $408 million. However, neither class counsel nor the defendants provide me with an analysis of the class's likelihood of success on liability.  To be sure, both class counsel and defendants mention the various legal and procedural hurdles that plaintiffs would face if this litigation continued, but their discussion of these matters is perfunctory.

Nonetheless, the parties emphasize that the settlements were the product of good faith, arms-length negotiations, and class counsel assures me that they "extensively analyzed the legal theories of the case, the risk, expense and delays of continued litigation

10

and determined [that] the proposed compromise is fair under the circumstances." (Esades Aff. [Docket # 335] ¶ 33.) For several reasons, I conclude that the circumstances surrounding the settlement negotiations, class counsel's opinion, and my own estimation of the strength of the plaintiffs' case are enough to enable me to conclude that the settlement is reasonable in light of the value of further litigation.

First, unlike cases in which the Seventh Circuit has encouraged district courts to take evidence on the value of continued litigation, this case does not present "suspicious circumstances." Reynolds, 288 F.3d at 284. In Reynolds, the history of the parties' settlement negotiations suggested that the parties may have colluded and performed a "reverse auction" – the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant. Id. at 282. The Reynolds court was especially concerned because the settlement would have extinguished a similar pending lawsuit that seemed promising without providing the class with consideration for releasing the claims involved in that suit. Id. at 283-84. The Reynolds court held that, in light of these and other circumstances, the district court should have performed a more searching inquiry into the fairness of the settlement. Id. at 284. The court noted that the district court could have insisted that the parties present evidence as to four possible outcomes (high, medium, low and zero) and the probability of obtaining each outcome at trial. Id. at 285. On remand, the district court followed the Seventh Circuit's suggestion and took evidence over the course of three days as to the value of the settlement. Reynolds v. Beneficial Nat. Bank, 260 F. Supp. 2d 680, 681 (N.D. Ill. 2003). The district court ultimately decided that the settlement was not fair, reasonable and adequate.

In contrast to <u>Reynolds</u>, the circumstances surrounding the present settlement are not suspicious. First, a reverse auction could not have occurred because I appointed class counsel for purposes of this MDL proceeding without any input from defendants. <u>See</u> Kent M. Williams, <u>A Touch of Class: Reducing the Risk of "Sweetheart Deals"</u>, 62 Bench & Bar of Minn. 20, 21 (2005) (noting that defendant's ability to select its negotiating partner is eliminated when class actions are removed to federal court and related cases are consolidated before the same judge, who chooses lead counsel and gives him or her exclusive authority to negotiate a settlement). Although it is true that the MTD and Honda settlements were reached by class counsel before I formally appointed them as such, I am still confident that the settlements were not the product of a reverse auction. Primarily, this is because it was class counsel who discovered that defendants may be overstating lawnmower horsepower and who filed the very first lawsuit based on such conduct in June 2004. If class counsel had been a lawyer who filed a photocopy of the original complaint, then I might suspect that defendants had shopped around for the most inept lawyer. But since class counsel consists of the lawyers who performed the "entrepreneurial work" behind this case, <u>In re Synthroid Mktg. Lit.</u>, 325 F.3d 974, 978 (7th Cir. 2003) ("<u>Synthroid II</u>"), I am confident that defendants did not choose to settle with class counsel in the hope of extinguishing cases filed by superior lawyers. I also note that, besides class counsel, dozens of other lawyers representing named plaintiffs have been involved in this MDL proceeding, and none has objected or otherwise indicated that class counsel agreed to an inadequate settlement.

Second, the parties have been engaged in settlement negotiations and mediation in one form or another for nearly seven years. All of the evidence in the record indicates that

12

these negotiations have been hard-fought, rather than collusive.  Edward Infante, the former Chief Magistrate Judge of the United States District Court for the Northern District of California, served as the mediator during the latest rounds of mediation, which lasted thirteen months.  He submits a declaration describing the contentiousness of the mediation sessions.  He also states that he became very familiar with the legal, factual and procedural issues in this case, and in his opinion the global settlement is an "excellent result" for the class.  (Infante Decl. ¶ 8.)

Third, during the course of this case, defendants have not maintained a united front but have splintered into factions, further minimizing the possibility of collusion.  One defendant, MTD, defected to the plaintiffs and agreed to supply evidence against the other defendants in exchange for a release.  Another defendant, Honda, agreed to settle with the plaintiffs years before the remaining defendants did so.  The remaining defendants entered into three separate settlement agreements with plaintiffs.  And defendants continue to squabble over their rights to contribution and indemnification.  In light of the numerous factions that have developed over the course of this litigation, I can hardly say that I find myself confronting a "phalanx of colluding counsel."  Thorogood v. Sears, Roebuck & Co., 547 F.3d 742, 745 (7th Cir. 2008).

Based on the above considerations, I conclude that I may place significant weight on the opinion of counsel in concluding that the settlement is reasonable in light of the value of further litigation.  In addition to counsel's opinion, I also compare the value of the settlement with a ballpark valuation of continued litigation.  The class will receive $65 million

in cash, plus warranty benefits.[6]  Class counsel proposes that I measure the value of the warranty benefits at their retail value, which class counsel estimates at $16 to $24 for walk-behind mowers and $71 to $123 for riding lawnmowers.  However, warranty benefits, like coupons, are a form of in-kind compensation, and "compensation in kind is worth less than cash of the same nominal value."  In re Mexico Money Transfer Lit., 267 F.3d 743, 748 (7th Cir. 2001); see also Synfuel, 463 F.3d at 654.  Warranty benefits are not coupons, to be sure, "since they represent an entire product, not just a discount on a proposed purchase."  Synfuel, 463 F.3d at 654.  Nonetheless, I am sure that if class members were given the choice between the retail cash value of the warranty benefits and the warranties themselves, the vast majority of them would choose cash.  Thus, I will not assume that the value of the warranty benefits to the class is equal to their retail value.

Besides calculating the value of the warranty benefits using their estimated retail value, class counsel offers a more conservative valuation based on the cost of the repairs that class members will likely claim under their extended warranties.  Class counsel estimates that 273,912 class members will have warranty repair work performed on their mowers.  Using historical data provided by defendants, class counsel estimates that the average cost of each repair will be $220 for riding lawnmowers and $86 for walk-behind mowers.  The total value of the warranty repair work expected to be claimed by the class under these estimates is $45.7 million.  (Esades Aff. [Docket #335] ¶ 32.)  I find that $45.7 million is a reasonable estimate of the value of warranty relief to the class.

_____

[6]I exclude the value of the injunctive relief because the parties have not attempted to put a value on it and also because the injunctive relief does not compensate the class for their alleged injuries.  See Synfuel, 463 F.3d at 654 (stating that fairness of settlement must be evaluated primarily on how it compensates class members for past injuries).

Adding the $65 million in cash and the $45.7 million in warranties, the value of the settlement can be estimated as $110.7 million. As noted, class counsel believes that if the class prevailed at trial it could recover damages in the range of $816 million to $2.5 billion. Under class counsel's view of the case, then, the settlement is reasonable so long as the class's likelihood of success on the merits is no better than 4.4% to 13.6%. In defendants' view, even if the class succeeded in proving that defendants had inflated their horsepower ratings, the class could recover no more than $1 to $6 per engine – or a total of $68 million to $408 million. If defendants' view were accepted, the value of the settlement would be anywhere between 27% and 163% of the value of further litigation – assuming that plaintiffs could prevail on all procedural and liability issues, which of course is not guaranteed (and probably unlikely).[7] These ballpark figures convince me that the value of the settlement is reasonable in light of the value of further litigation.

In the preceding discussion, I touched on some of the remaining factors that I must consider before approving the settlements, and therefore I will only briefly discuss them

---

[7]I say that total success is unlikely because, based on the present record, it seems unlikely that I would certify classes for trial. The highest hurdle to class certification is that the significance to each class member of defendants' alleged horsepower overstatements will vary. Some class members will likely not care that their lawnmowers are slightly less powerful than they thought – indeed, some class members wrote letters to the court in which they say just that – while others may be able to prove that the overstatements have caused them pecuniary harm. These individual issues would likely present "intractable [trial] management problems," making certification for anything other than settlement purposes inappropriate. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997); see also Thorogood, 547 F.3d at 747-48 (stating that class could not be certified because the effect of defendant's allegedly misleading statement on consumers was not uniform). Class certification might be appropriate if plaintiffs could prove that defendants' conspiracy caused them all to overpay for their lawnmowers by approximately the same amount, but in light of the numerous factors affecting the price of a lawnmower, the class would likely have considerable difficulty prevailing on such a claim.

further here.  The "complexity, length and expense of further litigation" factor strongly favors this settlement, in that further litigation would be enormously complex, lengthy and expensive.  The "amount of opposition to the settlement" factor also favors settlement.  Of the estimated 68 million potential class members, only 1,479 have opted out.  Sixty-eight class members have filed objections.  As of June 2010, over one million class members have filed claims for benefits, and thus the percentage of objections to claims made is only 0.006%.  As noted, the "opinion of competent counsel" also favors settlement.

The final consideration is "the stage of the proceedings and the amount of discovery completed at the time of settlement."  This consideration is important because it indicates how fully counsel was able to evaluate the merits of plaintiffs' claims.  Armstrong, 616 F.2d at 325.  In the present case, I am satisfied that counsel has been able to conduct an adequate evaluation.  Counsel has been prosecuting this case for seven years.  During that time, counsel has opposed two groups of motions to dismiss.  Although preliminary procedural issues – such as proceedings before the Panel on Multidistrict Litigation – have prevented this case from moving deep into discovery, counsel has nonetheless collected substantial information about the strength of plaintiffs' case through interviews with industry insiders, review of the information provided by MTD, and review of information provided by other defendants for the purposes of settlement negotiations.  Counsel has also hired engineering and economics experts to assist with the evaluation. I conclude that these facts weigh in favor of approving the settlements.

Before moving on, I address some of the class-member objections that pertain to the fairness of the MTD and Honda settlements.  Some objectors contend that the MTD settlement was the product of collusion rather than arms-length negotiations.  However, the

objectors have no evidence indicating that class counsel and MTD negotiated in bad faith. Instead, they point to the fact that plaintiffs released MTD from liability without receiving any monetary relief and claim that this is sufficient evidence of collusion. But the value of the MTD settlement came from MTD's agreement to assist plaintiffs in proving their case against the remaining defendants. The objectors suggest that this promise to cooperate was not particularly valuable, since plaintiffs could have obtained much of MTD's information through ordinary discovery channels. I disagree. As noted above, MTD provided plaintiffs with quite a bit of information about the operation of the alleged conspiracy, and there is a clear difference between voluntary cooperation and providing similar information through adversarial discovery mechanisms.[8] If nothing else, plaintiffs obtained information about the conspiracy earlier than they would have in discovery, enabling class counsel to better prepare for depositions and enhancing plaintiffs' settlement leverage against the remaining defendants.[9] Moreover, the objectors do not explain why class counsel would have colluded with MTD and entered into a cooperation-only settlement that provided little value to the class. MTD did not agree to pay attorneys' fees to class counsel, and thus, since class counsel was giving up their own chance for fees from MTD, they would not have agreed to the settlement unless they believed in good faith that the value of MTD's cooperation was

---

[8]Indeed, in the last few years Congress has recognized the value of a co-conspirator's agreement to cooperate with plaintiff's counsel. Pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, § 213, 118 Stat. 661, 666-67 (2004), a co-conspirator who agrees to cooperate with plaintiff's counsel against the remaining members of a conspiracy is relieved from exposure to treble damages and joint and several liability.

[9]I also note that if this case did not settle defendants would have filed motions to dismiss. If these motions were granted, the class would not have received any discovery at all.

comparable to the value of the class's claims against MTD. Thus, I conclude that the MTD settlement is not collusive.

One objector, David Marlow, argues that the Honda settlement is unfair because Honda has not agreed to provide warranty benefits. Under the plan for distributing benefits from the global settlement, class members who have lawnmowers with Honda engines will not receive warranty benefits, although they will receive the same cash benefits as all other class members. I view this primarily as an issue of the fairness of the allocation plan, which I address separately below. For now, I will say that, for the reasons explained above in connection with the global settlement, $7.5 million in cash is adequate consideration for the release of the class's claims against Honda.

Objector Marlow also argues that the Honda settlement is unfair because it was entered into in December 2006 yet, because notice of the settlement was not given until April 12, 2010, releases more than three years' worth of additional claims without additional consideration. However, at the time counsel negotiated the settlement, they recognized that the Honda settlement could not be noticed on its own, since notice costs would likely have swallowed the entire settlement amount. (Tr. of Fairness Hearing at 22.) Thus, counsel likely recognized that there would be a lengthy delay between the time the parties entered into the settlement and the time the class would receive notice of it. Counsel likely took this delay into consideration when agreeing to the settlement amount. In any event, as I have said, I find that $7.5 million is adequate consideration.

In sum, I find that all of the settlements are fair, reasonable and adequate.

**B.     Objections Relating to Allocation Plan and Claims Administration**

Several class members have raised objections relating to the allocation of settlement

benefits and claims administration.  First, various class members have written to the court stating that the process of submitting claims for benefits is overly burdensome.  To make a claim, a class member must include on his or her claim form the serial number of both the lawnmower and the lawnmower engine.  This procedure is not particularly burdensome for class members who still possess their lawnmowers, since the serial numbers can be found on the lawnmowers themselves.  However, class members who no longer possess their lawnmowers will have considerable difficulty making a claim, since they are unlikely to have paperwork listing the serial numbers.

Class counsel states that they elected to require class members to report their serial numbers in an effort to strike a proper balance between, on the one hand, avoiding fraudulent claims and keeping administrative costs low, and on the other hand, allowing as many class members as possible to claim benefits.  I agree that allowing class members to file claims without providing serial numbers would encourage fraudulent claims, in that persons could falsely represent that they purchased a lawnmower in the past but no longer have it or any records of it.  Although the claims administrator could take steps to validate claims submitted without serial numbers in order to weed out fraudulent claims – such as comparing each incomplete claim to records in the defendants' possession or reviewing receipts and other paperwork submitted by class members – requiring the claims administrator to do so for a large number of claims would substantially increase administrative costs.   In any event, class counsel states that if a class member submits a claim form without including the required serial numbers and the claims administrator is nonetheless able to determine that the claim is valid, the claims administrator will approve

the claim.[10]  Based on the foregoing, I conclude that requiring class members to include serial numbers on their claim forms was reasonable.

As noted above, objector David Marlow contends that the Honda settlement is unfair because Honda owners will not receive warranty benefits.  I explained above that Honda's $7.5 million cash payment is adequate consideration for the settlement.  However, Marlow's objection could be viewed as an objection to the allocation of settlement benefits, in that Honda owners receive less value under the allocation plan than other class members.  Class counsel states that the allocation plan is nonetheless fair to Honda owners because the case against Honda is not as strong as it is against the other defendants.  (Esades Aff. [Docket # 335] ¶ 17.)  In class counsel's opinion, the class could prove that Honda participated in the conspiracy and overstated its horsepower; however, Honda owners would have recovered less in damages than other class members because Honda did not overstate its horsepower by as much as the other defendants.

I conclude that the allocation plan is fair even though it does not provide Honda owners with extended warranties.  As noted above, the parties entered into the Honda settlement years before defendants decided to offer warranty benefits to class members. After the other settlements were reached, Honda indicated that it was willing to renegotiate its settlement and pay less cash in exchange for warranty benefits.  Recognizing that cash is more valuable than warranty benefits, class counsel declined to renegotiate.  To make the

---

[10]The notice to the class did not inform class members that if they did not know their serial numbers they could still make a claim.  However, this was reasonable, in that if class members were told that they could submit a claim without locating their serial numbers, few class members would have bothered to locate numbers on the mowers they still possessed, thereby needlessly increasing administrative costs.

settlement perfectly equitable, class counsel could have allocated slightly more cash to Honda owners than to other class members, in recognition of the fact that Honda owners will not receive extended warranties. However, because Honda's horsepower overstatements were not as egregious as the remaining defendants', class counsel determined that it was fair to allocate the same amount of cash to Honda owners as to other class members. I conclude that this determination was reasonable.

## C.  MTD's Payment of Notice Costs

At the preliminary approval hearing, defendant Husqvarna argued that, pursuant to the terms of the MTD settlement, MTD was required to pay the costs of notifying the class of the global settlement. Both MTD and class counsel disagreed with Husqvarna and argued that notice costs were to be deducted from the common settlement fund. I determined that because Husqvarna was not a party to the MTD settlement agreement, it did not have standing to challenge MTD's and class counsel's interpretation of the notice-costs provision, and that therefore their interpretation would control. However, objector David Marlow has raised this issue in his objections, and because he has standing to raise the issue I will reexamine it here.

The language of the MTD agreement that gives rise to the dispute is the following:

> MTD is responsible for payment of all notice costs relating to this settlement. However, in the event Plaintiffs enter into a settlement with any Non-MTD Defendant prior to publication notice being sent, Plaintiffs shall seek to obtain payment for notice costs from any such Non-MTD Defendants – assuming notice of the MTD Settlement can be provided with or in combination with notice of any Non-MTD Defendant's settlement. To the extent Plaintiffs are successful in such efforts, MTD shall not be responsible for the payment of notice costs associated with this settlement. In no event shall the Releasing Parties be responsible for any notice costs relating to this settlement.

(MTD Settlement Agreement ¶ 42.) In short, the agreement states that MTD must pay all

notice costs unless plaintiffs "obtain payment for notice costs" from at least one other defendant and notice of the MTD settlement can be combined with notice of that defendant's settlement.

When class counsel presented the global settlement to the court for preliminary approval, they along with MTD assumed that MTD would not be responsible for paying notice costs because all of the settlements were to be noticed at the same time and two of the non-MTD settlement agreements (the Group of Six and Kawasaki agreements) authorized notice costs to be deducted from their respective settlement funds. In other words, both class counsel and MTD thought that plaintiffs had "obtain[ed] payment for notice costs" from defendants other than MTD, thus relieving MTD of its obligation to pay notice costs. However, Marlow argues that MTD is not relieved of its obligation to pay notice costs because plaintiffs have not, in fact, "obtain[ed] payment for notice costs" from other defendants. Marlow's position is that although the Group of Six and Kawasaki settlements authorize notice costs to be paid from the settlement fund, this is not the same as an agreement by such defendants to pay notice costs. In Marlow's view, MTD is liable for notice costs unless another defendant expressly agrees to pay notice costs from a fund that is separate from the settlement fund created for the benefit of the class. It is undisputed that no other defendant has so agreed and that, unless MTD pays notice costs, such costs will be paid from the settlement funds and will ultimately diminish the class's recovery.

The MTD settlement agreement contains a choice-of-law provision selecting Illinois law. Under Illinois law, "[t]he primary objective in construing a contract is to give effect to the intent of the parties." Gallagher v. Lenart, 874 N.E.2d 43, 58 (Ill. 2007). A court must initially look to the language of a contract alone, as the language, given its plain and ordinary

meaning, is the best indication of the parties' intent.  Id.  If the language of the contract is susceptible to more than one meaning, it is ambiguous.  Id.  In that case, a court may consider extrinsic evidence to ascertain the parties' intent.  Id.

After considering the language of the MTD settlement agreement, I find that it is ambiguous as to whether the ability to deduct notice costs from the common fund created by the non-MTD settlements relieves MTD of its obligation to pay such costs.  In one sense, plaintiffs have "obtain[ed] payment for notice costs" from other defendants, in that notice costs have been paid from the settlement fund created by those defendants.  However, the MTD agreement could reasonably be read as requiring plaintiffs to obtain an express agreement by another defendant to pay notice costs out of a fund that is separate and distinct from the common fund.  Nonetheless, both class counsel and MTD represented in their briefs and at the preliminary approval hearing that they agree that the ability to pay notice costs from the common fund relieves MTD of liability for such costs.  Thus, after considering extrinsic evidence, I conclude that MTD is not required to pay notice costs.[11]


D.    **Attorneys' Fees and Costs**

I next address class counsel's request for costs and attorneys' fees, which will be

---

[11]Objector Marlow contends that if the contract is ambiguous then an evidentiary hearing is required.  However, the signatories of the MTD settlement agreement are class counsel and MTD's counsel, and they have already indicated their views as to the meaning of the disputed language.  I am aware of no other witnesses or evidence that could be presented at an evidentiary hearing, and therefore I conclude that such a hearing is not required.

deducted from the $65 million common fund.[12]  In deciding fee levels in common fund cases,

a district court must attempt to award counsel "the market price for legal services, in light of

the risk of nonpayment and the normal rate of compensation in the market at the time."

Sutton v. Bernard, 504 F.3d 688, 692 (7th Cir. 2007); see also In re Synthroid Mktg. Lit., 264

F.3d 712, 718 (7th Cir. 2001) ("Synthroid I"); Montgomery v. Aetna Plywood, Inc., 231 F.3d

399, 408 (7th Cir. 2000); In re Cont'l Ill. Sec. Lit., 962 F.2d 566, 572 (7th Cir. 1992)

("Continental I").  Where a district court waits until the end of litigation to set counsel's fee,

the court must attempt to estimate what the parties would have agreed to had negotiations

occurred at the outset of litigation.  Sutton, 504 F.3d at 693; Synthoid I, 264 F.3d at 718-19.

Class counsel requests costs in the amount of $576,391.19 and attorneys' fees in the

amount of $34,666,667.  I find that class counsel's costs were reasonably incurred in the

course of this litigation and that a paying client would reimburse counsel for such costs, and

therefore I approve their deduction from the common fund.  Synthroid I, 264 F.3d at 722

(costs are reimbursable if private client would reimburse for such costs); Continental I, 962

F.2d at 570 (same).

Regarding attorneys' fees, class counsel arrives at $34,666,667 by taking one-third

---

[12]Preliminarily, I note that some objectors have argued that class counsel failed to comply with Federal Rule of Civil Procedure 23(h)(1), which requires that notice of class counsel's motion for attorneys fees be "directed to class members in a reasonable manner." Class counsel did not serve notice of its actual motion for attorneys' fees on the class (other than through the court's ECF system, which makes all motions publicly available).  However, class counsel did give notice to the class of its intent to move for attorneys' fees in the amount of one-third of the settlement fund plus $14 million for the value of the warranty relief.  Although class counsel has not served the motion itself on class members, I conclude that providing class members with notice of the amount they intended to seek in fees was sufficient.  Indeed, numerous class members have objected to class counsel's fee request, which indicates that the class has received reasonable notice of the request.

of the $65 million common fund and adding $13 million to reflect the warranty relief obtained for the class.  As noted above, I find that the total value of the settlement is $110.7 million.  Class counsel thus requests 31.3% of the class's recovery.  However, in requesting $34 million, counsel had used the retail value of the warranty benefits and valued the settlement at $127.1 million.  Under class counsel's view of the settlement's value, they were requesting a fee of 27.3%.  To show that the market would compensate counsel at this percentage, class counsel points to the riskiness of the litigation, the fact that in counsel's opinion contingency fees of 33⅓% are common for cases of this type, and a law review article summarizing actual attorneys' fees awards in antitrust litigation.  See Robert H. Lande & Joshua P. Davis, Benefits from Private Antitrust Enforcement: An Analysis of Forty Cases, 42 U.S.F.L. Rev. 879 (2008).

In my view, however, the best indicator of what the market would pay class counsel for their services is the data contained in a recently updated study, Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees & Expenses in Class Action Litigation: 1993-2008, 7 J. of Empirical Legal Stud. 248 (2010) (hereinafter "Eisenberg & Miller 2010").[13]  Eisenberg and Miller studied 18 years of available opinions involving settlements in class action litigation in state and federal courts, with a total sample of 689 common fund cases.  Included in their study are two tables that provide fee information based on the type of case (antitrust, civil rights, consumer, etc.) and class recovery amount.  Id. at 262, 265 (Tables 5 & 7).  The tables included in this study are good indicators of what the market would pay for class

_____

[13]The 2010 study updated Eisenberg and Miller's original study, which reported data for class action litigation between 1993 and 2002.  See Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27 (2004) (hereinafter "Eisenberg & Miller 2004").

counsel's services because the tables show what attorneys have been paid in similar cases, and thus what class counsel could have expected when they decided to invest their resources in this case.  See Taubenfeld v. Aon Corp., 415 F.3d 597, 600 (7th Cir. 2005) (noting that attorneys' fees awarded in analogous class action settlements are indicative of proper fee level); Turner v. Murphy Oil USA, Inc., 472 F. Supp. 2d 830, 864 n.30 (E.D. La. 2007) (noting that Eisenberg and Miller study is good approximation of market price for class counsel's services).

Table 5 from Eisenberg and Miller indicates that the mean fee in antitrust cases is 22%, and that the mean fee in "consumer" cases is 25%.  In their 2004 study, however, Eisenberg and Miller cautioned courts that their "case category" tables might not be reliable indicators of the proper fee level.  Eisenberg & Miller 2004, supra, at 76.  Their conclusion was (and still is) that the size of the class's recovery is the single most important factor in determining class counsel's fee.  Eisenberg & Miller 2010, supra, at 250; Eisenberg & Miller 2004, supra, at 76.  Thus, I turn to Table 7 from their 2010 study, which lists fee percentages in terms of the amount of the class's recovery.

The value of the present settlement is $110.7 million, which puts this case in the decile of cases involving settlements between $69.6 million and $175.5 million.[14]  Eisenberg & Miller 2010, supra, at 265.  The mean fee percentage for recoveries in this decile is 19.4%.  The standard deviation for this decile is 8.4%, which means that fee requests of 11% to 27.8% are reasonable when viewed against fee awards in comparable cases.  See

_____

[14]When data are presented by decile, they are presented in ten groups of approximately equal number.  McGraw-Hill Dictionary of Scientific & Technical Terms 558 (6th ed. 2003).  Each decile in Table 7 consists of approximately 69 cases.

Eisenberg & Miller 2004, <u>supra</u>, at 74 (suggesting that courts view fee requests falling within one standard deviation of the mean as generally reasonable unless reasons are shown to question the fee).

As noted above, class counsel's request of $34 million in fees was a request for 27.3% of the value of the settlement, where the settlement is valued at $127.1 million. Thus, counsel's request approaches the limit of a reasonable fee. In my view, the value of the settlement is $110.7 million. Using the same fee percentage and applying it to this number, counsel's fee would be $30,221,100. However, because a class recovery of $110.7 million is almost halfway between the applicable decile's bounds of $69.9 million and $175.5 million, and because counsel's fee percentage should decrease as the size of the recovery increases, Eisenberg & Miller 2004, <u>supra</u>, at 263-64, I conclude that it is not appropriate to award a fee percentage that approaches the limit of a reasonable fee. Had the settlement been worth only $69.9 million, then perhaps such a high percentage would be appropriate. But with a settlement value of $110.7 million, I find that the applicable fee percentage should be 25%, with a resulting fee of $27,675,000.

Although a fee of 25% is still on the high side of a reasonable fee, I conclude that it is appropriate in light of the considerable risk that counsel undertook when they decided to bring this case. <u>Synthroid I</u>, 264 F.3d at 718 (stating that risk of nonpayment is factor to consider in setting fee); <u>Continental I</u>, 962 F.2d at 569 (emphasizing need to adjust attorney fee awards in class action litigation to account for risk). This is not a case in which a criminal prosecution against the defendants preceded the class's civil suit and established the defendants's liability, as is often the case in the antitrust context. Instead, class counsel had to build this case from the ground up, based on their own investigation. Counsel has sunk

over $500,000 in costs along with 36,142 hours of their time into this case, knowing that the suit might fail, in which case they would recover nothing. Thus, accounting for this risk, a fee of 25% is appropriate.

Cross-checking this fee against the fee that would be awarded under the lodestar method confirms that this fee is appropriate. The first step in determining the lodestar is to multiply the number of hours the attorney reasonably expended on the litigation times a reasonable hourly rate. Mathur v. Bd. of Tr. of S. Ill. Univ., 317 F.3d 738, 742 (7th Cir. 2003). Once the lodestar is calculated "[t]he total lodestar estimate is then divided into the proposed fee calculated under the percentage method." Manual for Complex Litigation (Fourth) § 14.122 (2004). The resulting figure represents the lodestar multiplier to compare to multipliers in other cases. Id. This multiplier is used to take class counsel's risk of nonpayment into account, and its use is mandatory in contingency fee cases. Florin v. Nationsbank of Ga., N.A., 34 F.3d 560, 565 (7th Cir. 1994).

Using the number of hours expended by class counsel on this case and their average hourly rate,[15] the lodestar is $13,391,870.25. Dividing this number into a fee of $27,675,000 results in a risk multiplier of 2.07. Turning again to Eisenberg and Miller, they report that the mean risk multiplier in cases involving class settlements comparable in size to the present settlement is 2.70. Eisenberg & Miller 2010, supra, at 274 (Table 15). Thus, under the lodestar method, a fee award of $27,675,000 results in a risk multiplier the is close to the

---

[15]Because I am performing the lodestar calculation only to cross-check the reasonableness of counsel's percentage-of-the-fund request, I will not extensively scrutinize counsel's documented hours or their hourly rate. Cf. Continental I, 962 F.2d at 568-70 (discouraging district courts from second-guessing counsel's hourly rate and reported time and expenses).

average multiplier for cases of this size.

Finally, some objectors argue that I should deny class counsel's request for interest on their fee award. However, the common fund has been and will continue to accumulate interest pending the distribution of payments to class members. The class will benefit from such interest, and there is no reason why class counsel should be deprived of the interest that accumulates on their share of the fund. See also Synthroid II, 325 F.3d at 980 (stating that attorneys' fee award must be adjusted to account for interest that accumulated on the common fund during litigation). Thus, class counsel is entitled to interest on their fee award.

**E.    Incentive Payments for Class Representatives**

Class counsel requests that the court award each class representative a service or incentive award of $1,000 from the common fund. Because there are 132 class representatives, the total cost of the requested awards is $132,000.

"Incentive awards are justified when necessary to induce individuals to become named representatives." Synthroid I, 264 F.3d at 722-23. In other words, incentive payments should be awarded when the potential recovery of any individual class member is so small that no class member would agree to represent the class absent additional compensation. If, however, "the market rate for incentive reimbursements" is zero – meaning that individuals would agree to represent the class without the promise of additional compensation – then incentive payments should not be awarded. Id. at 723; Continental I, 962 F.2d at 571-72. Incentive payments are not awarded as a matter of course; a named plaintiff must prove that he or she is entitled to a fee. Continental I, 962 F.2d at 572. Montgomery, 231 F.3d at 410.

In the present case, class counsel states that incentive payments of $1,000 are

appropriate because the named plaintiffs provided essential assistance in the litigation by locating and forwarding responsive documents and information (including questionnaires, photographs, manuals, sales materials and warranties), retaining their lawnmowers even though they wanted to dispose of them, and participating in conferences with class counsel. At the fairness hearing, class counsel conceded that not all 132 class representatives contributed the same amount of assistance, but counsel states that, on average, each class representative contributed about $1,000 in effort.

I conclude that inventive payments of $1,000 for each class representative are appropriate. Although it is possible that class counsel could have found class representatives willing to represent the class for free, I think that some additional incentive was needed. First, class counsel needed to recruit a fairly large number of class representatives, at least one from each jurisdiction. Second, at the time each individual agreed to represent the class, they would have known that this litigation would be long and complex and that they might be subject to depositions and cross examination at trial. Since no class member stood to recover more than a hundred dollars or so even if the suit was a complete success, the possibility of an incentive award at the end of the case was needed to convince class members to commit to the case. Third, $1,000 is close to the average incentive payment awarded to class representatives in other consumer class actions, see Theodore Eisenberg & Geoffrey P. Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA L. Rev. 1303, 1333 (2006), which suggests that $1,000 is the market rate for incentive reimbursements. Finally, the $132,000 total award is only a tiny percentage (0.12%) of the class's overall recovery. Thus, I will approve these payments.

**F.     Objectors' Motions to Intervene**

Several class members filed motions to intervene based on their belief that intervention is needed in order to object to the settlement and appeal any adverse rulings. However, the Supreme Court has held that objectors who are members of a certified class (as all objectors are here) need not formally intervene.  Devlin v. Scardelletti, 536 U.S. 1 (2002); see also Synthroid II, 325 F.3d at 976-77.  Thus, I will deny their motions to intervene as moot.

**G.     Motion for Protective Order**

One objector, David Marlow, sought written discovery from class counsel concerning certain aspects of the settlement.  Class counsel filed a motion for protective order seeking to block this discovery.  In their motion, class counsel states that Marlow never properly served his discovery requests, and that in any event the discovery is unwarranted.  Marlow did not respond to class counsel's motion and has not indicated whether class counsel has responded to his requests.  For this reason, I conclude that Marlow either received the requested discovery, is no longer interested in receiving it, or concedes that he is not entitled to it.  I will therefore deny class counsel's motion for a protective order as moot.

**H.     Defendants' Dispute Concerning Contribution and Indemnity Claims**

**1.     Husqvarna's Contribution and Indemnity Claims Against MTD**

Husqvarna objects to the MTD settlement on the ground that it purports to bar Husqvarna's claims for contribution and indemnity against MTD under the laws of twenty states.[16]  An example of one such state law is the Illinois Joint Tortfeasor Contribution Act,

---

[16]MTD concedes that its requested "bar order" will not extinguish any contractual indemnity claims Husqvarna may have against MTD.  (MTD Surreply [Docket #370] at 8-9.)

740 Ill. Comp. Stat. 100/2, which provides that a defendant who settles in good faith with a plaintiff is discharged from all liability for contribution.

The MTD settlement agreement provides as follows:

> This Settlement Agreement was entered into in good faith and based upon arms-length negotiation between the Settling Parties and their Counsel. The Settlement Agreement is intended to and shall serve as a bar to all claims for contribution and indemnity as among or against the Releasing Parties and the Released Parties under the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/2, and other applicable joint-tortfeasor statutes of other states. The Settling Parties agree to cooperate and make reasonable efforts to obtain a determination that the Settling Parties have entered into this Settlement Agreement in good faith.

(MTD Settlement Agreement ¶ 58.) Pursuant to this provision, plaintiffs and MTD ask that I sign a proposed order containing the following language:

> The Court finds that this Settlement was entered into in good faith based upon arms-length negotiation between the Settling Parties and their Counsel. The Settlement Agreement shall thus serve as a bar to all claims for contribution and indemnity as among or against the Releasing Parties and the Released Parties under the Illinois Joint Tortfeasor Contribution Act, 7740 ILCS 100/2, and other applicable joint tortfeasor statute, or common law principles, of other states.

(Prop. Order [Docket #332-5] ¶ 10.)

Husqvarna argues that I cannot enter an order containing this language because MTD and plaintiffs have not demonstrated that their settlement was reached in good faith. Notably, Husqvarna does not contend that plaintiffs and MTD did not settle in good faith; rather, it claims that the record does not permit me to make a finding of good faith. In this regard, Husqvarna claims that I must hold an evidentiary hearing for the purpose of taking evidence as to whether the settlement was reached in good faith. Husqvarna also notes that

_____

Thus, only Husqvarna's claims for contribution and non-contractual indemnity are at issue.

the laws of the twenty jurisdictions at issue have slightly different definitions of good faith, and it argues that MTD and plaintiffs must show that their settlement satisfies all twenty definitions.

Before addressing the merits of Husqvarna's objection, I address whether Husqvarna has standing to raise it. Husqvarna argues that it has standing because a defendant has standing to challenge a settlement to which it is not a party when that settlement will cause the defendant "plain legal prejudice." <u>Agretti v. ANR Freight Sys., Inc.</u>, 982 F.2d 242, 246-47 (7th Cir. 1992); <u>Quad/Graphics, Inc. v. Fass</u>, 724 F.2d 1230, 1232-33 (7th Cir. 1983). "Plain legal prejudice" includes "any interference with a party's contract rights or a party's ability to seek contribution or indemnification." <u>Agretti</u>, 982 F.2d at 247.

Here, Husqvarna contends that it will suffer plain legal prejudice because the MTD settlement purports to extinguish its contribution rights. However, Husqvarna's argument assumes that Husqvarna actually has contribution rights against MTD. If it does not, then Husqvarna has no standing to complain about the MTD settlement. <u>Donovan v. Robbins</u>, 752 F.2d 1170, 1178 (7th Cir. 1985) (stating that defendant who has no right of contribution against settling defendant cannot complain that settlement will interfere with its contribution rights). Yet, Husqvarna makes no attempt to show that it has a right of contribution against MTD. Indeed, Husqvarna concedes that contribution is not available under RICO or federal antitrust laws. (Husqvarna Mem. [Docket #362] at 17.) <u>See also</u> <u>Texas Indus., Inc. v. Radcliff Materials, Inc.</u>, 451 U.S. 630, 646 (1981) (holding that contribution is not available under federal antitrust laws). Husqvarna does state that its contribution rights are "governed by the laws of 20 separate jurisdictions" (<u>id.</u>), but it does not show that any of these jurisdictions would recognize a right of contribution under the circumstances of this case.

33

If this were a negligence or products liability action, I might assume that Husqvarna has contribution rights against other defendants. But this case is based on intentional misconduct by all defendants, and I am aware of no state that gives an intentional tortfeasor contribution rights. See, e.g., Appley v. West, 929 F.2d 1176, 1180 (7th Cir. 1991) (no right of contribution under Illinois law for intentional torts); 2 Dan B. Dobbs, The Law of Torts 1078 (2001) (recognizing that even in states that provide right of contribution, "contribution is still denied to intentional tortfeasors"). Perhaps Husqvarna could come up with a non-frivolous argument in favor of contribution rights against MTD, but it has not done so. Thus, it has not shown that the MTD settlement will cause it plain legal prejudice, and therefore it lacks standing to object to MTD's bar order.

Even if Husqvarna had standing to object to the MTD's bar order, I would overrule its objection on the merits. Although each state has its own gloss on the good-faith analysis, only one question matters in the present case: whether MTD can be deemed to have settled with plaintiffs in good faith where the primary consideration for the settlement was MTD's agreement to cooperate.[17] Husqvarna does not cite any case from any state holding that a settling defendant's agreement to cooperate with plaintiffs against the remaining defendants can never satisfy the good-faith requirement. But most states require the settling defendant to show that its settlement is a fair approximation of its proportionate liability, and

---

[17]I conclude that I do not need to hold an evidentiary hearing to resolve this issue. Even though states might normally hold evidentiary hearings as to good faith, procedure in federal courts is governed by federal rather than state law even when state law provides the rule of decision. Kijowska v. Haines, 463 F.3d 583, 589 (7th Cir. 2006). Further, federal courts normally hold evidentiary hearings only when necessary to resolve factual disputes. See, e.g., United States v. Villegas, 388 F.3d 317, 324 (7th Cir. 2004). Here, the relevant facts are undisputed, and the only question is whether, as a matter of law, those facts show that the MTD settlement was reached in good faith.

that it is not trying to "shift a disproportionately large, and thus inequitable, portion of [its] liability onto the shoulders of another." Stickler v. American Augers, Inc., 757 N.E.2d 573, 578 (Ill. App. Ct. 2001). Husqvarna essentially argues that by settling for cooperation and no cash, MTD is not paying its fair share of the horsepower-inflation conspiracy's joint and several liability. But, as noted in the context of standing, above, Husqvarna does not provide me with any details about the claims for contribution it plans to bring against MTD, and so it does not offer any suggestions as to how liability would be apportioned among the members of this conspiracy. Cf. Texas Indus., Inc.., 451 U.S. at 637-38 (listing various ways liability might be apportioned among members of an antitrust conspiracy). Since Husqvarna is silent on the issue, I will simply assume that liability would be apportioned pro rata, "assessing an equal amount against each participant on the theory that each one is equally liable for the injury caused by collective action." Id. at 637. Assuming that the injury caused by the conspiracy's output has been fixed as the value of the global settlement – i.e., $110.7 million – each member's pro rata share of the group's liability is $9,225,000 ($110.7 million divided by twelve, the number of defendants in this case).

I conclude that MTD's cooperation can be roughly valued at $9 million. As noted, class counsel found MTD's cooperation to be extremely valuable in proving their case against the remaining defendants, and I do not think it is unreasonable to credit MTD's cooperation with one-twelfth of the value of the class's total recovery. At the very least, I cannot find that MTD's cooperation is worth so little that MTD is attempting to shift a disproportionately large share of its liability onto the shoulders of the remaining defendants, especially since Husqvarna makes no attempt to explain what MTD's fair share should be. Accordingly, I conclude that plaintiffs and MTD settled in good faith.

## 2. Husqvarna's Indemnity Claims Against Co-Defendants Other Than MTD.

Husqvarna does not object to the remaining defendants' settlements insofar as they seek good-faith determinations and purport to bar Husqvarna's contribution and non-contractual indemnity claims. However, Husqvarna objects to these settlements insofar as they purport to bar indemnity claims that Husqvarna may have against the engine-manufacturing defendants pursuant to written contracts. As a manufacturer of lawnmowers, Husqvarna purchased engines from the engine-manufacturing defendants, and Husqvarna believes that the written contracts formed at the time of purchase give it indemnity rights against those defendants. Husqvarna objects to the proposed bar orders insofar as they seek to extinguish these rights. Because Husqvarna has submitted an affidavit in which it explains that it has contracts with the engine-manufacturing defendants that include indemnity provisions, I conclude that Husqvarna will suffer plain legal prejudice if these claims are extinguished and thus has standing to object to the settlements to the extent that they purport to extinguish such claims. Agretti, 982 F.2d at 247.

Notably, however, no settlement agreement or proposed order approving any settlement agreement contemplates that I will enter an order expressly stating that indemnity claims based on written contracts are barred. Rather, the language to which Husqvarna objects reads as follows: "[This settlement] is in good faith and bars, extinguishes, and discharges claims against [the settling defendants] by any other Defendants for contribution or indemnity under federal and state law." Husqvarna interprets this language as barring contractual indemnity claims, as does Kohler, the only defendant that has filed a brief in

36

opposition to Husqvarna's objection.[18]

In the context of apportionment of liability among joint tortfeasors, however, the term "indemnity" does not always mean express contractual indemnity, especially when it appears in the phrase "contribution and indemnity." Rather, this term can be used to refer to various claims – similar to claims for contribution – that have been recognized under state law for purposes of fairly apportioning liability among joint tortfeasors. These claims are sometimes labeled with the term "indemnity." See, e.g., Am. Motorcycle Ass'n v. Superior Court, 578 P.2d 899, 902 (Cal. 1978) (recognizing "right of partial indemnity, under which liability among multiple tortfeasors may be apportioned on a comparative negligence basis"). As noted, under the laws of some of the jurisdictions that recognize these kinds of indemnity claims, such claims (along with claims for contribution) may be extinguished upon a finding that a tortfeasor has settled in good faith. See, e.g., Willdan v. Sialic Contractors Corp., 69 Cal. Rptr. 3d 633, 637 (Cal. Ct. App. 2007) ("A settlement made in good faith . . . bars claims against the settling defendant for contribution or indemnity by other joint tortfeasors, including claims for total [equitable] indemnity, partial indemnity and implied contractual indemnity."). However, to my knowledge, no state's law allows indemnity claims based on express written contracts to be extinguished upon a finding of good faith. Cf. Donovan, 752 F.2d at 1178 ("[W]e know of no principle under which a settlement could interfere with the rights of other tortfeasors to seek indemnity (as opposed to contribution) from the settling defendants.").

Kohler argues that even though state law does not permit contractual indemnity

---

[18]Both Honda and Kawasaki have "joined" Kohler's opposition to Husqvarna's objection, but they have not filed their own briefs.

claims to be extinguished upon a finding of good faith, a federal court has discretion to extinguish such claims as part of the settlement of federal litigation. In support of this argument, Kohler cites In re U.S. Oil & Gas Litigation, 967 F.2d 489 (11th Cir. 1992), a case in which the Eleventh Circuit upheld a bar order that extinguished claims for contribution, indemnity, breach of fiduciary duty, fraud and negligence. Kohler seems to read this case to hold that a district court has inherent authority to bar claims of any sort – state or federal – so long as the court finds it desirable to do so in order to facilitate a settlement. However, the court in Oil & Gas was dealing with the settlement of a federal securities-fraud case, and some courts have recognized that federal securities law gives district courts authority to enter bar orders involving claims for contribution. See In re Jiffy Lube Sec. Lit., 927 F.2d 155, 160 n.2 (4th Cir. 1991). The question presented in Oil & Gas was whether the bar order authorized by federal securities law could apply to state-law claims that are essentially the barred contribution claims re-labeled as state-law fraud and fiduciary duty claims, and the court held that it could. 967 F.2d at 496 (stating that scope of bar order should not turn on "the labels which parties attach to [their] claims"). Thus, Oil & Gas does not hold that federal courts have inherent authority to enter bar orders in every federal litigation, but that they have authority to do so when settling federal securities claims.

The present case is not a securities case, and thus any bar order permitted by federal securities law is inapplicable. Kohler points out that some courts have recognized that a district court has authority to enter bar orders under other federal laws, including ERISA and RICO, and argues that because plaintiffs have alleged RICO claims I have authority to enter a bar order as a matter of federal law. However, no Seventh Circuit case of which I am aware authorizes district courts to enter bar orders as a matter of federal common law. To

38

the contrary, the Seventh Circuit has expressly declined to authorize district courts to enter bar orders in ERISA cases, and because the Seventh Circuit views bar orders unfavorably I have no reason to think that it would authorize bar orders in RICO cases. <u>See</u> <u>Summers v. State Street Bank & Trust Co.</u>, 453 F.3d 404, 413 (7th Cir. 2006); <u>Donovan</u>, 752 F.2d at 1181. Thus, I conclude that federal law does not authorize me to bar claims of any kind – whether for contribution, indemnity or otherwise – and that the scope of any bar order entered in this case must be limited to claims that may be barred under state laws such as the Illinois Joint Tortfeasor Contribution Act.

Reading the proposed bar orders against this legal backdrop, I conclude that they bar only those claims that may be barred by a finding of good faith under the laws of the states that allow entry of settlement bar orders – i.e., contribution claims and indemnity claims based on equitable principles rather than written contracts. This means that Husqvarna's contractual indemnity claims will not be extinguished even if I enter the proposed bar orders. Thus, although I agree with Husqvarna that I cannot extinguish its contractual indemnity rights, I find that I may enter the requested bar orders without interfering with such rights. I will therefore sign the parties' proposed orders.

### III. CONCLUSION

For the reasons stated,

**IT IS ORDERED** that plaintiffs' motion for final approval of class action settlements is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for attorneys' fees, litigation expenses, and class-representative service awards is **GRANTED-IN-PART** and **DENIED-IN-PART**. The motion is granted to the extent that each class representative is awarded a

service payment of $1,000 and class counsel is awarded attorneys' fees in the amount of $27,675,000, plus any interest earned, and reimbursement of litigation expenses in the amount of $576,391.19.  In all other respects, the motion is denied.

**IT IS FURTHER ORDERED** that plaintiffs' motion for a protective order is **DENIED** as **MOOT**.

**FINALLY, IT IS ORDERED** that the objectors' motions to intervene (Docket ##321, 324 & 353) are **DENIED** as **MOOT**.


Dated at Milwaukee, Wisconsin this 16 day of August, 2010.


/s _____
LYNN ADELMAN
District Court Judge